UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| **BSC-C&C JV,** | Civ. No. 2:13-cv-06444 (WJM) |
| **Petitioner,** | |
| **v.** | **OPINION** |
| **THE LOUIS BERGER GROUP, INC.,** *et al.*, | |
| **Respondents.** | |

**WILLIAM J. MARTINI, U.S.D.J.:**

Petitioner BSC-C&C JV ("BSC") filed this action against The Louis Berger Group, Inc. ("LBG"), Black & Veatch Special Projects Corp. ("Black & Veatch"), and The Louis Berger Group, Inc./Black & Veatch Special Projects Corp. Joint Venture (the "Joint Venture," and together with LBG and Black & Veatch, "Respondents"). This matter comes before the Court on BSC's motion to confirm an October 10, 2013 arbitration award (the "Award") issued by Arbitrators A.H. Gaede, Jr., John P. Madden, and Thomas H. Welby (the "Panel"). In return, Respondents filed a cross-motion seeking to vacate the Award. In response to the cross-motion to vacate the Award, Petitioner appears to request sanctions under Federal Rule of Civil Procedure 11. There was no oral argument. Fed. R. Civ. P. 78(b). For the reasons set forth below, Petitioner's motion to confirm is **GRANTED**, and Respondents' cross-motion to vacate is **DENIED**. Petitioner's request for sanctions is **DENIED**.

## I.    BACKGROUND

On April 26, 2008, BSC and the Joint Venture entered into a subcontract (the "Contract") under which BSC agreed to perform work on a road from Gardez to Khost in Afghanistan (the "Project"). Decl. of Michael S. Zicherman ("Zicherman Decl.") Ex. E. ¶ 35, ECF No. 12-3. The Panel's exhaustive 96-page Award, issued after a 15-day hearing including testimony from 18 witnesses, deals with numerous issues arising from the Project. This factual summary will focus on the facts relevant to the alleged errors raised in Respondents' cross-motion to vacate the Award.

The Project was one of several that the Joint Venture undertook in Afghanistan. Zicherman Decl. Ex. E ¶ 35. The Joint Venture was responsible for the road's design, and BSC participated in the road's construction. *Id.* ¶¶ 37-38. BSC had until December

17, 2009 to complete the Contract work, which was 600 calendar days. *Id.* ¶ 39.  The Contract contained an arbitration provision.  Zicherman Decl. Ex. C.

Following the Contract's execution, BSC began the tasks necessary to mobilize to perform the work.  Zicherman Decl. Ex. E ¶ 43.  BSC planned the work in three sections: Section 1, Section 2, and Section 3.  *Id.*  A large part of this dispute stems from issues with Section 1.  BSC constructed the road in layers.  The Contract originally specified that, when constructing the road, BSC should place a 30 cm drainage layer of material with 0-8% fines immediately below the crushed aggregate base (the "CAB").  *Id.* ¶¶ 158-59.  Following difficulties locating the material necessary to create this layer, the Joint Venture deleted that requirement.  *Id.*  The Joint Venture did not specify what material BSC should use instead, so BSC used unclassified borrow, a material with significantly greater fines content (up to 35% fines).  *Id.* ¶ 159.  In the fall of 2008, BSC proceeded to construct Section 1 without the 0-8% layer, and had performed substantial work before stopping for the winter weather.  *Id.* ¶¶ 158-59.

In December of 2008 cracks in the roadway became apparent, and further cracks appeared in April 2009.  Zicherman Decl. Ex. E ¶ 160.  On May 16, 2009, the Joint Venture reinstated the requirement for the 0-8% layer.  *Id.*  BSC then began to manufacture the 0-8% material and used that material below the CAB in kilometers 10-27 of Section 1.  *Id.* ¶ 161.  Accordingly, Section 1 was finally constructed as follows: (1) 0-10 km, no 0-8% layer but instead repaired at specific spots and given an overlay of asphalt, (b) 10-20 km, existing work removed and replaced with the 0-8% layer included, and (c) 20-27 km, constructed with the 0-8% layer.  *Id.* ¶ 162.  The Panel found that before the remedial work, the cracks were extensive from 0-20 kilometers, but were not everywhere.  *Id.* ¶ 165.  The Panel further found that after the remedial work there continued to be a substantial number of cracks from 1-10 kilometers, which had no 0-8% material.  *Id.*  On the other hand, only a limited number of cracks appeared in kilometers 10-27, where the 0-8% material was placed.  *Id.*

Unsurprisingly, the parties had differing viewpoints as to who should bear responsibility for the cracks in the roadway.  The Joint Venture's expert, Mr. Geoffery Rowe, opined that the roadway failure in Section 1 had multiple causes, including a high percentage of fines and poor drainage.  Zicherman Decl. Ex. E ¶ 209.  Based on photographs, another expert for the Joint Venture, Mr. John D'Angelo, concluded that the roadway failure was caused by a lack of ditches.  *Id.* ¶ 210.  BSC maintained that the primary cause of the failure was the lack of a 0-8% layer.  *Id.* ¶ 208.  The Joint Venture also provided evidence showing that BSC had failed to provide the required binder course thickness in some areas.  *Id.* ¶ 211.  The Panel discounted Mr. Rowe's testimony on the grounds that "Mr. Rowe had previously worked with BSC with regard to the failures in Section 1" and was therefore "in an obvious conflict situation."  *Id.* ¶ 209 n.10.  The Panel further found that the Joint Venture had failed to establish that under-thickness was a factor in the extensive pavement failures.  *Id.* ¶ 211.  The Panel ultimately concluded that the Joint Venture's deletion of the 0-8% layer was responsible for the pavement failures in Section 1.  *Id.* ¶ 215.

The Panel also considered issues stemming from worksite security.  Security was a major concern, and the Joint Venture contracted with separate companies to provide security for the Project.  Zicherman Decl. Ex. E ¶ 40.  Security became a major issue between BSC and the Joint Venture.  The Panel found that the Joint Venture was slow in providing security, causing delay to the work in all sections during 2008.  *Id.* ¶ 44. Additionally, under the Contract the Joint Venture was liable for any deteriorating security conditions, and security conditions significantly deteriorated as the Project progressed.  *Id.* ¶¶ 71-76.  From 2008 until BSC left the Project in early 2011, many security incidents caused damages to property, injury and death to persons, and delays in work progress.  *Id.* ¶¶ 46-47.  Pursuant to the Contract, BSC submitted claims to the Joint Venture for costs and damages associated with the security incidents and other delays. *Id.* ¶ 47.  However, the parties disagreed regarding BSC's compensation for those delays. *Id.* ¶¶ 48-49.

The Panel evaluated the various delays, determining which delays were compensable and the amount due to BSC for the compensable delays.  The Panel ultimately awarded $3,710,265 for the delay claims.  Zicherman Decl. Ex. E ¶ 358.  In doing so, the Panel noted that the "scheduling experts were of little, if any, help" in reaching its decision.  *Id.* ¶ 330.  Instead, it relied on the documentary evidence, which included the Joint Venture's own internal documents, to make its determination.  *Id.*

Finally, BSC alleged that it had experienced cash flow problems because (i) the Joint Venture did not timely pay some periodic contract payments, (ii) the Joint Venture did not timely address and pay for BSC's claims, and (iii) the significant project delays without compensation for fixed costs increased BSC's costs and depleted its cash flow. *Id.* ¶ 359.  The Panel found that the Joint Venture's conduct contributed to BSC's cash flow problems, but that the evidence did not support BSC's claim for $4,109,750.  *Id.* ¶ 372.  Instead, the Panel accepted the calculations of the Joint Venture's expert witness, Mr. Stephen Bennett, and awarded $983,000 to BSC.  *Id.*

## II.    LEGAL STANDARD

Courts rarely disturb arbitration awards, and the presumption is that the award is enforceable.  *Freeman v. Pittsburgh Glass Works, LLC*, 709 F.3d 240, 251 (3d Cir. 2013).  A court will vacate an award only under the "exceedingly narrow" circumstances listed in Section 10(a) of the Federal Arbitration Act (the "FAA").  *Dluhos v. Strasberg*, 321 F.3d 365, 370 (3d Cir. 2003).  Specifically, a court will vacate the arbitrator's decision where:

(1) the award was procured by corruption, fraud, or undue means;

(2) there was evident partiality or corruption in the arbitrators, or either of them;

(3) the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or

(4) the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a); *Hall Street Associates, LLC v. Matel*, 552 U.S. 576, 584 (2008) ("*Hall Street*") (holding that the FAA's enumerated grounds for *vacatur* are exclusive). A party seeking *vacatur* bears the burden of showing that an arbitration award, or any part of an award, should be vacated. *Handley v. Chase Bank*, 387 Fed. App'x 166, 168 (3d Cir. 2010).

Prior to *Hall Street*, it was widely accepted that a court could also vacate an award if the arbitrator showed a "manifest disregard for the law." *Ludwig Honold Mfg. Co. v. Fletcher*, 405 F.2d 1123, 1128 (3d Cir. 1969) (internal quotations omitted). Post-*Hall Street*, Supreme Court and Third Circuit case law have left open the question of whether the manifest disregard standard still applies. To demonstrate manifest disregard, the party seeking to vacate an award must show that the arbitrator acknowledged and subsequently disregarded an explicit, well-settled, and clearly applicable legal rule in making her decision. *Paul Green Sch. of Rock Music Franchising, LLC. v. Smith*, 389 F. App'x 172, 177 (3d Cir. 2010). Courts have also vacated awards where the arbitrator manifestly disregarding the agreement providing the basis for the award. *News Am. Publications, Inc. Daily Racing Form Div. v. Newark Typographical Union Local 103*, 921 F.2d 40, 41 (3d Cir. 1990) (internal quotations omitted) ("[O]nly where there is a manifest disregard of the agreement, totally unsupported by principles of contract construction and the law of the shop, may a reviewing court disturb the award.").

## III.  DISCUSSION

Respondents argue that the Court should vacate the Award for four reasons:

(A) The Panel incorrectly discounted the testimony of the Joint Venture's expert, Dr. Rowe, as conflicted.

(B) The Panel erred by awarding damages for compensable delay notwithstanding its rejection of BSC's expert testimony on that issue.

(C) The Panel exceeded its jurisdiction by granting loan interest damages due to impacted cash flow.

(D) The Panel acted with evident partiality.

Respondents also argue that the Court should refuse to confirm the Award against the LBG and Black & Veatch, because the Award was issued against the Joint Venture and not the individual companies that comprise the Joint Venture.

### A.  Dr. Rowe's Testimony

Dr. Rowe provided expert testimony for the Joint Venture, opining that the cracks in Section 1 resulted from BSC's construction defects rather than the road's design. The Panel discounted his testimony, finding that he was conflicted because he had "previously worked with BSC with regard to the failures in Section 1." Zicherman Decl.

4

Ex. E ¶ 209 n.10.  Although Dr. Rowe did work for BSC related to its construction of the road, he apparently did not do any work related to the failures in Section 1.  Respondents argue that, under FAA Sections 10(a)(3) and 10(a)(4), the Court should vacate the Award due to this factual error.  Specifically, Respondents argue that the Panel "misconducted" itself and "exceeded its powers" by discounting Dr. Rowe's opinion.  The Court disagrees.

The Panel's decision to discredit Dr. Rowe's testimony does not violate the FAA.  First, although the Panel incorrectly stated that Dr. Rowe worked on the failures in Section 1, the Panel correctly stated that Dr. Rowe worked for BSC on the roadway.  Declaration of Joseph A. McManus, Jr. ("McManus Decl.") Ex. 14 §§ 3.1, 3.2, ECF No. 19-3.  Accordingly, the Panel had reason for finding that Dr. Rowe had a conflict of interest.  And, despite the Joint Venture's lamentations to the contrary, the Joint Venture was apparently aware of the risk that the Panel would discount Dr. Rowe's testimony.  *See* Reply Declaration of Peter E. Moran ("Moran Decl.") Ex. E ¶¶ 269:22-271:8, ECF No. 21-2 (containing testimony by another expert for the Joint Venture, Dr. D'Angelo, in which he stated that he was retained in part due to concerns that Dr. Rowe's reports would viewed as biased).

Second, even if the Panel did incorrectly discount Dr. Rowe's testimony, that error would not provide grounds for vacating the Award.  The Third Circuit sets "an extremely high bar" for vacating an award on the grounds of misconduct under Section 10(a)(3).  The proponent must "show misconduct so severe that it denies the aggrieved party of a fundamentally fair hearing."  *Stone v. Bear, Stearns & Co., Inc.*, 872 F. Supp. 2d 435, 450 (E.D. Pa. 2012) *aff'd*, 538 F. App'x 169 (3d Cir. 2013) *cert. denied*, 134 S. Ct. 2292 (U.S. 2014).  Accordingly, even "[a]n arbitrator's refusal to hear evidence does not automatically mandate the *vacatur* of an award."  *Hoteles Condado Beach, La Concha and Convention Center v. Union de Tronquistas Local 901*, 763 F.2d 34, 39 (1st Cir. 1985).  Here, the Panel did not ignore or refuse to consider Dr. Rowe's testimony.  Rather, it "largely discounted his opinion and testimony."  Zicherman Decl. Ex. E ¶ 209 n.10.  And Dr. Rowe's testimony was not the only evidence before the Panel.  Dr. Rowe was one of nine witnesses called by the Joint Venture, five of which were experts.  Zicherman Decl. Ex. E ¶ 30.  Additionally, the Panel conducted over three weeks of hearings, reviewed pre- and post-hearing briefs, and reviewed hundreds of documentary exhibits before issuing the Award.  Thus, even if discounting Dr. Rowe's testimony was in error, that error did not deprive the Joint Venture of a fundamentally fair hearing and did not amount to misconduct under Section 10(a)(3).  *See Pompano-Windy City Partners, Ltd. v. Bear Stearns & Co., Inc.*, 794 F. Supp. 1265, 1277 (S.D.N.Y. 1992) (holding that even an improper exclusion of testimony would not constitute denial of a fundamentally fair hearing where plaintiffs had the opportunity to present virtually all of their evidence and a wealth of evidence supported the award).

Likewise, the Panel did not exceed its powers under Section 10(a)(4).  An arbitrator exceeds his powers "when [1] he decides an issue not submitted to him, [2] grants relief in a form that cannot be rationally derived from the parties' agreement and

submissions, or [3] issues an award that is so completely irrational that it lacks support altogether." *Sutter v. Oxford Health Plans LLC*, 675 F.3d 215, 219-20 (3d Cir. 2012). The decision to discount Dr. Rowe's testimony does not fall under any of these categories. The decision to discredit Dr. Rowe's testimony simply was not the central basis for the Panel's decision. As explained above, the Panel considered and cited a great deal of evidence in deciding that the Joint Venture was responsible for the Section 1 failures. And much of that evidence supports the Award. Thus, even assuming that the Panel's credibility determination was in error, it would not provide grounds for vacating the Award.

### B.  Damages for Compensable Delay

Respondents also contest the Panel's $3,710,265 award for compensable delay. The Panel's First Scheduling and Procedural Directive (the "First Directive"), which was agreed to by the parties, provides that "each party has the burden of providing the facts relied on in support of its claims or defenses." McManus Decl. Ex. 3 ¶ 30. Respondents argue that because the Panel rejected BSC's expert testimony and BSC had the burden of proving the facts supporting its claim, the Panel should have held that BSC failed to meet its burden. Instead, Respondents argue, the Panel exceeded its powers and manifestly disregarded the law by performing its own delay analysis. The Court disagrees.

The Panel did not exceed its powers by issuing an award for compensable delay. Contrary to Respondents' assertions, the Panel did not perform an independent delay analysis. Rather, the Panel relied on documentary evidence, which included the Joint Venture's own internal documents, to arrive at its conclusions regarding compensable delay. The Panel's decision is far from "so completely irrational that it lacks support altogether." *See id.*

Further, the Panel did not manifestly disregard the law or any contract terms by awarding damages for the delays. As explained above, whether manifest disregard is grounds for vacating an award is an unsettled issue in the Third Circuit. The Court need not decide that issue because, even assuming that manifest disregard still applies, the facts would not warrant vacating the Award. First, Respondents have not shown that the Panel acknowledged and disregarded an explicit, well-settled, and clearly applicable legal rule in reaching its decision. *Paul Green Sch. of Rock*, 389 F. App'x at 177. Respondents cite the applicable legal rule for proving compensable delay, but point to nothing in the record indicating that the Panel ignored that rule in issuing the Award. To the contrary, the Award indicates that the Panel weighed multiple sources of information and decided that the evidence justified an award for compensable delay. *See* Zicherman Decl. Ex. E pg. 60-78. Second, the Panel did not disregard the terms of the Contract or the First Directive by finding that the expert testimony was "little, if any, help" and basing its decision on the other available evidence. The parties granted the Panel the power to determine the weight of the evidence. Moran Decl. Ex. A ¶ 33. And nothing required the Panel to base its decision on expert testimony.

### C.  Loan Interest Damages

Respondents next argue that the Panel exceeded its powers and manifestly disregarded the law by awarding $938,000 to BSC for loan interest damages.  The Panel found that BSC was entitled to loan interest damages because the Joint Venture's conduct, including the Joint Venture's delays in paying BSC's claims, caused disruptions in BSC's cash flow.  BSC was thus entitled to damages for interest it paid to finance the Contract work during these disruptions.

Respondents argue that the Panel exceeded its jurisdiction by awarding loan interest damages, because the claim for loan interest damages was only contained in BSC's "modified total cost" claim.  The Panel lacked jurisdiction over the modified total cost claim, Respondents argue, because that claim was not first subjected to the Contract's two-tiered dispute resolution process.  Respondents further argue that awarding loan interest damages constituted manifest disregard for the law.

Regarding the jurisdictional argument, Respondents admit that the Panel had jurisdiction to determine the arbitrability of all issues.  In fact, the Panel considered the instant argument.  It found that the modified total cost claim was not actually a new claim, but instead was a method of proving damages.  Moran Decl. Ex. F.  Where the parties have submitted an issue of arbitrability to the arbitrator for consideration, a court hesitate to interfere with her determination.  *See T.Co Metals, LLC v. Dempsey Pipe & Supply, Inc.*, 592 F.3d 329, 345 (2d Cir. 2010) (holding that where the parties grant the arbitrators authority to determine the scope of a rule regarding arbitrability, a court must "afford significant deference to the arbitrator's interpretation of that rule").  A court will affirm the arbitrator's determination unless the arbitrator ignored the plain language of the agreement.  *Major League Umpires Ass'n v. Am. League of Prof'l Baseball Clubs*, 357 F.3d 272, 281 (3d Cir. 2004).

Here, the Contract provides that "any dispute" must be submitted to an internal dispute resolution process before commencing arbitration.  The term dispute is not defined.  The Panel thus did not ignore the plain language of the Contract in finding that it had jurisdiction to consider the modified total cost claim.  Rather, the Panel made the reasonable determination that the modified total cost claim was in fact an alternative method of calculating damages, and not a separate "dispute" requiring submission to the two-tiered dispute resolution process.

Further, assuming once again that manifest disregard still applies, the facts would not warrant vacating the Award.  The Joint Venture has not shown that the Panel acknowledged and subsequently disregarded a clear and controlling point of law in making its decision.  And the Joint Venture argument that the Panel demonstrated manifest disregard by failing to apply the interest rate specified in the Contract for late Interim Payment Certificates ("IPCs") and instead awarding loan interest damages is unavailing.  The Panel did not base the claim for loan interest payments exclusively on the delays in receiving payments on the IPCs, so the interest rate provision was not clearly applicable to this claim.

### D.  Evident Partiality

Respondents also seek to vacate the award on the grounds that the Panel acted with evident partiality.  Evident partiality exists where a reasonable person would have to conclude that an arbitrator was partial to one party to the arbitration.  *Kaplan v. First Options of Chicago, Inc.*, 19 F.3d 1503, 1523 n.30 (3d Cir. 1994) *aff'd*, 514 U.S. 938 (1995).  "'Evident partiality' is strong language and requires proof of circumstances 'powerfully suggestive of bias.'"  *Id.* (quoting *Merit Ins. Co. v. Leatherby Ins. Co.*, 714 F.2d 673, 681-82 (7th Cir. 1983)); *see also Nationwide Mut. Ins. Co. v. Home Ins. Co.*, 278 F.3d 621, 626 (6th Cir. 2002) ("The alleged partiality must be direct, definite, and capable of demonstration, and the party asserting evident partiality must establish specific facts that indicate improper motives on the part of the arbitrator.").  Thus, courts have required the party seeking vacation to allege the potential source of the arbitrator's prejudice.  *TQM Const. Co. v. New Jersey Bldg. Const. Laborers Dist. Council, Local 394*, No. 11-831, 2011 WL 1327501, at \*5 (D.N.J. Apr. 4, 2011); *see e.g., Commonwealth Coatings Corp. v. Continental Casualty Co.*, 393 U.S. 145, 147 (1968) (vacating an arbitration award due to the arbitrator's failure to disclose his close financial relationship with the prevailing party).

The instant case does not involve a powerful suggestion of bias.  As an initial matter, the Joint Venture does not allege any source for the supposed bias of the Panel in arriving at the Award.  Rather, the Joint Venture rehashes its meritless arguments, considered above, contesting the Panel's various rulings.  In addition, the Joint Venture complains that (1) the Panel did not agree to its requests for additional clarification regarding the amount of damages sought until the eighth day of hearings; (2) abusively questioned its principle fact witness, Mary Lien; and (3) imposed a one-sided requirement on the Joint Venture to produce the documents it intended to rely upon in its defense.  Regarding the first contention, the record shows that the Panel repeatedly required clarification from BSC regarding its damages claims and that the Joint Venture was informed enough about the damages sought to provide a 431-page expert report containing alternative damages calculations.  McManus Decl. Ex. 19.  Also, while BSC sought up to $48 million in damages, the Panel ultimately awarded only $15.9 million to BSC.  Moran Decl. Ex. D, p. 16; Zicherman Decl. Ex. E ¶ 415.  As to the second contention, the First Directive explicitly allowed the Panel to question the witnesses, and the Panel also questioned BSC's witnesses.  McManus Decl. Ex. 3 ¶¶ 28, 34.  And the record shows that the Panel was seeking clarification from Ms. Lien, who admitted that her prior testimony was incorrect.  McManus Decl. Ex. 30 ¶¶ 20:13-25, 21:1-16; *see e.g., Health Servs. Mgmt. Corp. v. Hughes*, 975 F.2d 1253, 1264-65 (7th Cir. 2004) (holding that an arbitrator's questioning directing a witness to a particular section of the contract, which supplied the witness with a particular answer, was not evidence of partiality, as the parties agreed to allow the arbitrators to ask questions and there is nothing prejudicial about an arbitrator wanting to get to the essence of an issue before the panel).  Respondents' third contention also fails to show evident partiality, as the parties agreed in the First Directive that they would be responsible for producing documentary support.  McManus Decl. Ex. 3 ¶¶ 7, 9, 10.

Respondents thus have failed to demonstrate any compelling grounds for *vacatur*, and the Court will confirm the Award.  Further, despite Respondents' argument that the individual partners should not be held liable for the Award, the Court will confirm the Award against LBG and Black & Veatch.  *See Carlyle Joint Venture v. H.B. Zachry Co.*, 802 S.W.2d 814, 815 (Tex. App. 1990) (holding that when a joint venture is a party to an arbitration proceeding that results in an award against the joint venture, the individual partners of the joint venture are individually and severally liable for the award under the law of partnerships).

Finally, in a single sentence of its Opposition to the Joint Venture's Cross-Motion to Vacate, BSC argues that Respondents' evident partiality argument is frivolous and should be subject to Rule 11 sanctions.  BSC did not comply with the proper procedure for filing a motion for sanctions, and BSC's request for Rule 11 sanctions is thus denied.  *See* Fed. R. Civ. P. 11(c)(2).

## IV.    CONCLUSION

For the reasons stated above, Petitioner's motion to confirm is **GRANTED** and Respondents' cross-motion to vacate is **DENIED**.  Petitioner's request for sanctions is **DENIED**.  An appropriate order and judgment follows.


_____/s/ William J. Martini_____
**WILLIAM J. MARTINI, U.S.D.J.**


**Date: July 15, 2014**